1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

JOHN HALL, et al.,

CASE NO. C15-0594JLR

11

                    Plaintiffs,

ORDER

12

            v.

13

ENCOMPASS INSURANCE
COMPANY OF AMERICA,

14

                    Defendant.

15

## I.   INTRODUCTION

16

17

18

19

20

21

22

This matter comes before the court on cross-motions for summary judgment.  This is an insurance case in which Plaintiffs John Hall and Cathie Hall ("the Halls") brought suit against their insurer, Defendant Encompass Insurance Company of America ("Encompass"), seeking to resolve a dispute arising out of a fire at their property on December 16, 2011.  (*See* Compl. (Dkt. # 1).)  The Halls first moved for partial summary judgment, seeking an order 1) entitling them to funds that Encompass recovered as the

1  Halls' subrogee from the tortfeasor allegedly responsible for causing the underlying fire,

2  and 2) declaring that the insurance policy's replacement cost provision requires only

3  stating the intent to replace property, as opposed to actually replacing the property, within

4  180 days.  (*See* Mot. (Dkt. # 8) at 3.)  Encompass cross-moved for summary judgment on

5  these two issues.  (*See* Resp. (Dkt. # 11) at 1-2.)  Encompass's cross-motion also seeks to

6  invoke the policy's appraisal rights and dismiss the Halls' claims under the Insurance

7  Fair Conduct Act ("IFCA"), RCW 48.30.015, and for bad faith.  (*See* Resp. at 2.)

8      Having considered the submissions of the parties, the balance of the record, and

9  the relevant law,[1] the court GRANTS in part and DENIES in part both parties' motions.

10                    **II.   BACKGROUND**

11     On December 16, 2011, a fire destroyed significant personal property in the Halls'

12  garage.  (6/11/15 Hall Decl. (Dkt. # 9) ¶¶ 2-4.)  The Halls had an insurance policy

13  through Encompass (*see* Webster Decl. (Dkt. # 14) ¶ 4, Ex. C ("Policy") at 17), which

14  ran from July 20, 2011 to July 20, 2012 and covered much of their personal property

15  (Compl. ¶ 6).  The Halls submitted a claim to Encompass, seeking to have their covered

16  losses reimbursed.  (*See id.* ¶ 7.)  The Halls' losses included destruction of hundreds of

17  personal items, which were covered under their policy (*see* Compl. ¶ 13; 6/11/15 Hall

18  Decl. ¶ 14, Ex. B at 13-14; Webster Decl. (Dkt. # 14) ¶ 5, Ex. E), and extensive damage

19  to two collectible automobiles, which were not covered (*see* 6/11/15 Hall Decl. ¶¶ 4-5).

20

21  _____

22      [1] The parties do not request oral argument and the court finds it unnecessary for the
disposition of these motions.  *See* Local Rules W.D. Wash. LCR 7(b)(4).

1    To assess the damage and begin processing the claim, Encompass first sent Steven

2  Potter to visit the fire site. (*See* 7/20/15 Hall Decl. (Dkt. # 18) ¶ 4.)  Mr. Potter informed

3  Mr. Hall that a third party would clean and restore the damaged items, but that promise

4  subsequently proved unfeasible. (*See id.* ¶¶ 4-5.)  Encompass then assigned Molly

5  Webster, one of its content specialists, to the claim. (*Id.* ¶¶ 6-7.)  Ms. Webster asked the

6  Halls not to disturb or enter the garage until she could evaluate the damages in person.

7  (*Id.* ¶ 7.)  She visited the Halls' garage on December 28, 2011, and worked with Mr. Hall

8  to inventory, photograph, and make notes on the site. (*Id.* ¶ 8.)  After spending part of

9  the day at the site, Ms. Webster left with a handwritten inventory of damaged items and

10  provided a copy to Mr. Hall. (*Id.* ¶ 9.)  A portion of the garage could not be accessed

11  during her visit to the Halls' garage because it was cordoned off awaiting forensic

12  analysis. (*Id.* ¶ 8.)

13    On January 31, 2012, Ms. Webster informed the Halls that Encompass required 30

14  additional days to conclude the claims process. (*See* Webster Decl. ¶ 2, Ex. A at 36.)

15  Following that letter, Ms. Webster sent a similar letter roughly every 30 days, informing

16  the Halls that Encompass needed 30 more days to process their claim. (*See id.* at 1-35.)

17  Apparently omitting only June, 2013 (*see id.* at 19-20), and October, 2013 (*see id.* at 15-

18  16), Ms. Webster sent these letters every month or so until November, 2014 (*see id.* at 1-

19  36).  These letters ceased and contact proceeded through counsel after the Halls informed

20  Encompass on November 19, 2014, of their intent to assert a claim under IFCA. (*See*

21  6/11/15 Hall Decl. ¶ 14, Ex. B at 8, 17.)

22

ORDER- 3

1    Over the course of the Halls' correspondence with Ms. Webster, several important

2  exchanges occurred.  In a letter dated September 23, 2013, Ms. Webster offered the Halls

3  a settlement of $62,651.62 in actual cash value for their loss, the first such offer they had

4  received from Encompass.  (7/20/15 Hall Decl. ¶ 10, Ex. C at 1.)  Mr. Hall hired an

5  assistant so that he could compare the offer to his own inventory, and found a

6  discrepancy of hundreds of thousands of dollars.  (See 7/20/15 Hall Decl. ¶¶ 12-13, Exs.

7  D-E.)  In a November 5, 2013, meeting to review the differences in inventories, Ms.

8  Webster confirmed that the Halls' collectibles and artwork were wrongfully depreciated

9  in her worksheet.  (See id. ¶ 14.)  She borrowed the notebooks and inventory that Mr.

10  Hall and his assistant had compiled so that she could reconcile the inventories.  (See id.

11  ¶ 16.)  She subsequently offered a second settlement loss on June 25, 2014, which totaled

12  $259,027.54.  (See id. ¶ 17, Ex. I at 1.)  Although the Halls assert that amount did not

13  remedy all of the errors in Encompass's initial valuation, as of April 20, 2015,

14  Encompass had paid the Halls $263,577.09 in actual cash value payments.[2]

15    In her September 23, 2013, letter, Ms. Webster also notified the Halls that

16  pursuant to their policy they had a 180-day deadline—beginning on the date of loss—to

17  replace damaged items in order to recover their replacement cost; otherwise, the Halls

18  were limited to the actual cash value, which factors in depreciation.  (See 7/20/15 Hall

19  Decl. ¶ 10, Ex. C at 1; 6/11/15 Hall Decl. ¶ 14, Ex. B at 16.)  In the letter, Ms. Webster

20

21  _____

22  [2] The court calculated this by adding "Advance Payments" of $249,092.04 and "ACV Payments Made" of $14,485.05 from Ms. Webster's April 20, 2015, Payment Worksheet. (See Webster Decl. ¶ 5, Ex. E at 2.)

1   extended this 180-day "holdback deadline," giving the Halls until December 16, 2013, to

2   replace items and make claim for their replacement value. (*Id.*) According to Mr. Hall,

3   this is the first notice he had that Encompass interpreted the policy in this fashion. (*See*

4   7/20/15 Hall Decl. ¶ 11.) The Halls read the clause to require only that the Halls provide

5   notice of intent to replace items, rather than actually completing replacement, within that

6   180-day window. (*See* 6/11/15 Hall Decl. ¶ 14, Ex. B at 3-4; Mot. at 11-12.)

7   Encompass, through its representatives, made several further extensions of the holdback

8   deadline, culminating in a final deadline of April 10, 2015, for the Halls to submit

9   receipts.[3] The Halls only ever submitted one replacement cost claim, on March 25, 2015.

10  (*See* Webster Decl. ¶ 5.) In response to that claim, Encompass paid the Halls

11  $30,290.50—the difference between the replacement cost and the actual cost for these

12  replaced items—via two checks dated April 15, 2015, and April 21, 2015. (*See id.*)

13  Encompass estimated that after that payment, $68,789.41 in replacement cost benefits

14  remained. (*See* 6/11/15 Hall Decl. ¶ 8, Ex. A.) Mr. Hall asserts that he still has

15  reimbursement claims for which he has not been fully paid, but for which he made claim

16  within the 180-day window. (*See* 7/20/15 Hall Decl. ¶ 19.)

17

18  _____

19  [3] Ms. Webster made several such extensions of the holdback deadline: On November 21, 2013, she extended the deadline to March 16, 2014 (*see* Webster Decl. ¶ 2, Ex. A at 15); on

20  February 17, 2014, she extended the deadline to May 16, 2014 (*see id.* at 12); on April 21, 2014, she extended the deadline to June 16, 2014 (*see id.* at 10); and on June 25, 2014, she extended

21  the deadline to December 25, 2014 (*see id.* at 7). Next, Michael McCormack, attorney for Encompass, took over communications: On December 10, 2014, he extended the deadline to

22  February 9, 2015 (*see* McCormack Decl. (Dkt. # 12) ¶ 2, Ex. A at 3); and on February 3, 2015, he extended the deadline—for the final time—to April 10, 2015 (*see id.* ¶ 3, Ex. B at 1).

1       Meanwhile, after paying the Halls for their actual cash value claims, Encompass

2  filed a subrogation lawsuit against Harper Electric, the alleged tortfeasor responsible for

3  causing the fire. (Compl. ¶ 12.) The Halls also filed suit against Harper. (6/11/15 Hall

4  Decl. ¶ 18.) The record is unclear as to when exactly these lawsuits were filed, but they

5  were consolidated in King County Superior Court. (*See id.* ¶ 19.) In March, 2015, the

6  Halls learned that Encompass was nearing settlement with Harper. (*See id.* ¶ 20.)

7  Through counsel, the Halls contacted Mr. McCormack and informed him that they had

8  not been made whole for their losses caused by the fire.[4] (Compl. ¶ 14; 6/11/15 Hall

9  Decl. ¶ 22, Ex. D at 1.) Accordingly, the Halls maintained, they were entitled as

10  subrogor to any funds Encompass acquired via settlement or suit, up to and until the Halls

11  were made whole for the extent of the damages they incurred in the fire. (*See* 6/11/15

12  Hall Decl. ¶ 22, Ex. D. at 1.) The Halls requested that Encompass keep the proceeds of

13  its settlement with Harper in a court registry until it could be determined which party is

14  entitled to the funds. (*See id.*) This communication from the Halls to Encompass came

15  on the morning of March 27, 2015, just a few hours before Harper's settlement offers to

16  the Halls and Encompass expired. (*See id.*)

17       Notwithstanding the letter, both parties reached independent settlements with

18  Harper; the Halls received $132,500.00, Encompass received $182,500.00, and both

---

20    [4] The Halls have presented undisputed evidence that as of June 11, 2015, they were at
least $248,394.00 from being made whole from the damages incurred in the fire. (Mot. at 6;

21  6/11/15 Hall Decl. ¶ 28.) This is based on Encompass's estimates of content losses, the Halls'
uncontested calculation of damages to their two uninsured automobiles, Encompass's calculation

22  of payments made to the Halls, and the undisputed settlement amount between the Halls and
Harper. (*Id.*)

ORDER- 6

1   released all claims against Harper arising out of the fire. (*See id.*, Ex. F ("Halls

2   Settlement"); *id.*, Ex. E ("Encompass Settlement").)  Harper's insurance policy had a

3   liability limit of $2 million. (*See* Shumsky Decl. ¶ 4.)  Encompass declined to place its

4   recovery in a court registry and takes the position that under Washington law, the made

5   whole doctrine does not apply to insurer subrogation suits and thus to the extent it had

6   already reimbursed the Halls, it was entitled to subrogate and retain funds from Harper.

7   (*See* Resp. at 10-12.)  Encompass did, however, reimburse the Halls their $1,000.00

8   deductible after settling with Harper. (Webster Decl. ¶ 6.)

9        The Halls filed this suit against Encompass on April 15, 2015. (*See* Compl.)  They

10   state claims for breach of contract, bad faith, and violation of the Consumer Protection

11   Act ("CPA"), RCW 19.86.010 *et seq.*, and IFCA. (*Id.* ¶¶ 15-18, 21-29.)  In addition, they

12   seek declaratory relief that 1) entitles them to the $182,500.00 that Encompass obtained

13   in its settlement with Harper, and 2) interprets the policy to require only that the insured

14   state the intent to replace goods—rather than actually replace them—within a 180-day

15   window. (*Id.* ¶¶ 19-20.)  The Halls moved for partial summary judgment on these two

16   claims for declaratory relief. (Mot.)  Encompass cross-moved for summary judgment on

17   those issues and also seeks summary judgment on the Halls' claims for violation of IFCA

18   and bad faith. (*See* Resp.)  Lastly, Encompass's cross-motion seeks to invoke its

19   contractual appraisal rights to resolve disputed property valuations, and asks the court to

20   stay the case pending the outcome of that appraisal. (*Id.* at 13-15.)

21

22

ORDER- 7

# III.   ANALYSIS

## A.   Summary Judgment Standard

Summary judgment is appropriate if the evidence, when viewed in the light most favorable to the non-moving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. Cty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007). The moving party bears the initial burden of showing there is no genuine issue of material fact and that he or she is entitled to prevail as a matter of law. *Celotex*, 477 U.S. at 323. If the moving party meets its burden, the burden shifts to the non-moving party to "make a showing sufficient to establish a genuine dispute of material fact regarding the existence of the essential elements of his case that he must prove at trial." *Galen*, 477 F.3d at 658. The court is "required to view the facts and draw reasonable inferences in the light most favorable to the [non-moving] party." *Scott v. Harris*, 550 U.S. 372, 378 (2007).

## B.   The Halls' Right to be Made Whole

Both parties seek summary judgment that they are entitled to the funds Encompass recovered from Harper in its settlement. (*See* Mot. at 6-11; Resp. at 10-12.) The Halls contend that Encompass did not have a right to assert subrogation rights until the Halls were made whole, including for the uninsured automobiles lost in the fire. (*See* Mot. at 6-11.) Encompass responds that the made whole doctrine applies not to subrogation rights, but only when an insurer seeks reimbursement from its insured for funds its insured recovered from the tortfeasor. (*See* Resp. at 10-11.) Encompass adds that to the

1  extent the made whole doctrine does apply, the Halls have not overcome the presumption

2  that they were made whole when they settled with Harper for less than Harper's liability

3  limits. (*See* Resp. at 11-12.)

4        When an insurer pays its insured for damages suffered, and the insured also

5  recovers money in a direct suit against the tortfeasor, the insurer has an equitable right to

6  reimbursement. *See, e.g.*, *Roberts v. Safeco Ins. Co.*, 941 P.2d 668, 670-71 (Wash. Ct.

7  App. 1997).  However, this right is limited in an important way—the insurer "can recover

8  only the excess which the insured has received from the wrongder, remaining after the

9  insured is fully compensated for his loss." *Thiringer v. Am. Motors Ins. Co.*, 588 P.2d

10  191, 193 (Wash. 1978).  This principle is called the made whole doctrine. *See, e.g.*,

11  *Averill v. Farmers Ins. Co. of Wash.*, 229 P.3d 830, 833 (Wash. Ct. App. 2010).  To be

12  made whole and allow an insurance company to seek reimbursement, an insured must not

13  merely have recovered his policy limits; he must have recovered for all of the relevant

14  damages—insured and uninsured. *See Thiringer*, 588 P.2d at 195.  This right to be made

15  whole is cabined, however, by type of damages:  "[A]n insurer is entitled to

16  reimbursement where its insured recovers payment for the *same loss* from a third party."

17  *Meas v. State Farm Fire and Cas. Co.*, 123 P.3d 519, 525 (Wash. Ct. App. 2005) (citing

18  *Thiringer*, 588 P.2d at 191).  For instance, if an insurer makes its insured whole for

19  personal property damages and the insured recovers further money from the tortfeasor for

20  that personal property damage, the insurer can seek reimbursement of that money without

21  obligation to make the insured whole for any personal injuries he may have incurred in

22  the same incident. *Id.*  Washington case law is clear that the made whole doctrine applies

ORDER- 9

1   to an insurer's right to reimbursement, and Encompass does not dispute that here. *See,*

2   *e.g., Averill*, 229 P.3d at 833; (*see also* Resp. at 10.)

3          The issue presented by the parties is whether the made whole doctrine applies

4   when the insurer asserts its equitable subrogation rights and recovers money directly from

5   the tortfeasor.[5]  The court's task is to determine how the Washington Supreme Court

6   would decide this issue. *See Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1482 (9th Cir.

7   1986).  In the insurance context, subrogation refers to the insurer's right, after paying

8   benefits to its insured, "to all the rights and remedies belonging to the insured against a

9   third party with respect to any loss covered by the policy."  Black's Law Dictionary 1654

10  (10th ed. 2014).  Typically, insurers enforce this right by suing a third-party tortfeasor to

11  recover money the insurer paid its insured. *See Mahler v. Szucs*, 957 P.2d 632, 640

12  (Wash. 1998) ("In the insurance context, the 'doctrine of subrogation enables an insurer

13  that has paid an insured's loss pursuant to a policy . . . to recoup the payment from the

14  party responsible for the loss.'" (quoting Elaine M. Rinaldi, *Apportionment of Recovery*

15  *Between Insured and Insurer in a Subrogation Case*, 29 TORT & INS. L.J. 803, 803

16  (1994)), *order corrected on denial of reconsideration*, 966 P.2d 305 (Wash. 1998).  A

17  number of Washington Supreme Court decisions appear to apply the made whole

18  _____

19      [5] The insurance policy's "general provisions" contain a contractual subrogation clause, which allows Encompass to "require an assignment of rights of recovery to the extent that payment is made by us."  Policy at 30.  "If such an assignment is sought," the Halls "must sign

20  and deliver all related papers and cooperate with" Encompass. *Id.*  The parties do not discuss this contractual provision in their briefing and there is no evidence that Encompass requested or

21  received an assignment from the Halls.  Because there is no evidence that Encompass ever invoked its contractual subrogation rights as required by the insurance policy, the subrogation

22  clause of the policy is not at issue.  Accordingly, the court analyzes subrogation under the governing common law principles.

1   doctrine to the right of "subrogation," and the Halls cite to several of those decisions to

2   support their argument.  (*See* Halls Reply at 2-3.)  However, all of those cases—and

3   several others that the Halls do not reference—in fact either address reimbursement or

4   base their reasoning on precedent that addresses reimbursement.  *See Sherry v. Fin.*

5   *Indem. Co.*, 160 P.3d 31, 34-35 (Wash. 2007) (citing *Thiringer* in the context of insurer

6   offsets); *Winters v. State Farm Mut. Auto. Ins. Co.*, 31 P.3d 1164, 1167-68 (Wash. 2001)

7   (applying the made whole doctrine in the reimbursement setting); *Mahler*, 957 P.2d at

8   645-49 (analyzing whether an insurer must compensate its ensured for expenses the

9   insured incurred in its direct suit against the tortfeasor); *Leingang v. Pierce Cty. Med.*

10  *Bureau, Inc.*, 930 P.2d 288, 291 & n.2 (Wash. 1997) (citing *Thiringer* in the context of a

11  reimbursement dispute); *Brown v. Snohomish Cty. Physicians Corp.*, 845 P.2d 334, 339

12  (Wash. 1993) (discussing *Thiringer*); *Thiringer v. Am. Motors Ins. Co.*, 588 P.2d 191,

13  191-92 (1978) (determining the priorities "between an insurer and its insured, in the

14  proceeds of a settlement effected by the insured with the party responsible for his

15  injuries"); *see also Averill*, 229 P.3d at 833 (discussing the cases subsequent to *Thiringer*

16  in which Washington appellate courts applied the made whole doctrine, none of which

17  involve subrogation).  The confusion engendered by these cases stems from the

18  Washington Supreme Court's imprecise use of the term "subrogation."  *See, e.g.*,

19  *Winters*, 31 P.3d at 1167-68 (defining "[t]raditional subrogation" overly broadly as "an

20  equitable doctrine involving three parties, permitting one who has paid benefits to one

21  party to collect from another"); *see also Mahler*, 957 P.2d at 640 (acknowledging that the

22

ORDER- 11

1  "precise enforcement mechanism for the subrogee's right" is a question of

2  "[c]onsiderable imprecision . . . in case law").

3      Because the Washington Supreme Court has not applied the made whole doctrine

4  in a true subrogation case, this court "must resort to other authority and exercise [its] own

5  best judgment in determining how that court would resolve the issue." *Burns v. Int'l Ins.*

6  *Co.*, 929 F.2d 1422, 1424 (9th Cir. 1991).  "[W]hile decrees of 'lower state courts' should

7  be 'attributed some weight . . . the decision (is) not controlling' where the highest court

8  of the State has not spoken on the point." *Comm'r of Internal Revenue v. Bosch's Estate*,

9  387 U.S. 456, 465 (1967) (quoting *King v. Order of United Commercial Travelers*, 333

10  U.S. 153, 160-61 (1948)); *see also Burns*, 929 F.2d at 1424 ("Decisions by the state

11  courts of appeals provide guidance and instruction and are not to be disregarded in the

12  absence of convincing indications that the state supreme court would hold otherwise.");

13  *In re Elliott*, 446 P.2d 347, 370 (Wash. 1968) ("Judicial decisions are an integral part of

14  the laws of the several states when announced by the highest state court, for the state's

15  highest court is the best authority for state law.  And, if there be no decision on the

16  precise point in issue before the federal court, then, . . . federal authority must apply what

17  they find to be the state law after giving proper regard to relevant rulings of other courts

18  of the State.") (internal citations and quotations omitted).

19      Encompass contends that the Washington Court of Appeals' decision in *Averill*

20  conclusively precludes applying the made whole doctrine in the subrogation context.

21  (*See* Resp. at 11-12; Encompass Reply at 1-2.)  There is language in *Averill* to that effect,

22  but that case was decided on several bases that differentiates it from the case at bar.  First

1   of all, *Averill* concerned principles of contractual subrogation, *see* 229 P.3d at 836,

2   whereas there is no evidence or argument that Encompass seeks to exercise its

3   contractual subrogation rights, *see supra* Note 5.  Moreover, *Averill* concerned an

4   insured's effort to recoup her deductible.  *Id.* at 832 ("The parties here ask the court to

5   determine whether the made whole doctrine applies to insurance policy deductibles.").

6   As the Court of Appeals reasoned, allowing the insured to recover his deductible would

7   effectively alter the risk allocation the parties agreed to ex ante, which is tantamount to

8   "chang[ing] the insurance contract to one without a deductible." *Id.* at 834.  Because

9   altering the policy in this way is outside the court's power, the Court of Appeals

10  concluded it was inappropriate to include the deductible among the funds the insured

11  must recover to be made whole.[6]  *See id.*  Washington's appellate courts have only once

12  referenced *Averill*'s determination regarding the made whole doctrine, and it was in an

13  unpublished decision involving a similar dispute over whether the insured must recover

14  his insurance deductible before being considered whole.  *See Somal v. Allstate Prop. &*

15  *Cas. Ins. Co.*, 2012 WL 119895, at *1 (Wash. Ct. App. Jan. 17, 2012) (unpublished)

16  (reading *Averill* to hold "that when an insurer obtains a recovery in subrogation from a

17  third party, the insured is not entitled to reimbursement for the deductible paid by the

18

19

20      _____

          [6] Although the Office of the Insurance Commissioner overruled this aspect of the *Averill*
21  decision by enacting WAC 284-30-393, which requires a subrogee to pursue and reimburse a
    subrogor's deductible, that regulation was not in place when the accident underlying *Averill*
22  transpired and the *Averill* court declined to apply the regulation retroactively.  *Averill*, 229 P.3d
    at 834-36.  Accordingly, the *Averill* court reasoned as if no such regulation existed.

ORDER- 13

1   insured under the common law 'made whole' rule"). This case concerns the Halls' right

2   to be made whole for uninsured property damage, not their insurance deductible.

3       Further differentiating this case from *Averill* is the fact that Encompass "made a

4   play" for funds from Harper with full knowledge that the Halls sought to recover directly.

5   *See Lease Crutcher Lewis WA, LLC v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, No.

6   C08-1862RSL, 2010 WL 4272453, at *3 & n.2 (W.D. Wash. Oct. 15, 2010). Encompass

7   argues that it neither interfered with the Halls' settlement nor ensured the Halls could not

8   be made whole by exhausting Harper's insurance policy. (Resp. at 12.) It is true that the

9   Halls' settlement was nominally independent and that money remained available under

10  Harper's liability coverage, even after Harper settled with the Halls and Encompass. (*See*

11  Hall Settlement; Encompass Settlement; Shumsky Decl. ¶ 4.) But Harper and its insurer

12  were apparently willing to pay at least $315,000.00—the combined amount of Harper's

13  settlements with Encompass and the Halls—to be released from all liability arising from

14  the December 16, 2011, fire. (*See id.*) Harper was unobligated to pay twice for the same

15  damages arising from the same alleged tort, but presumably if Encompass had stepped

16  aside to allow its insured to proceed independently against Harper, the Halls could have

17  recovered the full $315,000.00 that Harper was willing to pay to settle claims. In this

18  case, as Encompass concedes, the Halls would have been entitled to keep that money to

19  the extent it was necessary to make them whole. (*See* Resp. at 10.) Instead, Encompass

20  actively pursued recovery against Harper despite having notice of an ongoing effort by

21  the Halls to similarly recover. (*See* Encompass Settlement (referencing consolidated case

22  in King County Superior Court); 6/11/15 Hall Decl. ¶ 22, Ex. D. at 1.)

ORDER- 14

1    "Subrogation is an equitable doctrine the essential purpose of which is to provide

2    for a proper allocation of payment responsibility." *Mahler*, 957 P.2d at 640.  It is far

3    from equitable to allow an insurer to circumvent its insured's right to be made whole by

4    asserting its equitable subrogation rights in the face of a known direct suit by the insured.

5    This practice could largely abrogate the made whole doctrine and provide windfalls to the

6    insurer, a far cry from the policy preference that the Washington Supreme Court

7    announced in *Thiringer*: "that it fosters the adequate indemnification of innocent . . .

8    victims."  Accordingly, the court concludes that the Halls' right to be made whole

9    applies, and that in these circumstances that right takes precedence over Encompass's

10   subrogation recovery.[7]

11         Nonetheless, Encompass correctly argues that because the Halls settled with

12   Harper, and Harper's $2 million insurance policy was far from depleted after settling with

13   the Halls and Encompass, Washington courts apply a presumption that their settlement

14   made the Halls whole.  (*See* Resp. at 10-11 (citing *Peterson v. Safeco Ins. Co. of Ill.*, 976

15   P.2d 632, 635 (Wash. Ct. App. 1999)); Shumsky Decl. ¶ 4); *see also Loc Thien Truong v.*

16   *Allstate Prop. & Cas. Ins. Co.*, 211 P.3d 430, 434-35 (Wash. Ct. App. 2009) ("[A]

17   settlement with a tortfeasor for less than limits is evidence that the [insured] received full

18   compensation.").  The Halls' settlement—even when combined with Encompass's

19

20         [7] The court's conclusion is not that the made whole doctrine applies broadly in the
21   context of subrogation, as there are prudent reasons not to so extend its applicability.  The court's
     ruling is limited to the factual circumstances confronted here—namely, an insurer asserting its
22   equitable subrogation rights with knowledge of a contemporaneous lawsuit by its insured against
     the underlying tortfeasor.

ORDER- 15

1  settlement—did not approach Harper's $2 million liability limits.  (*See* Shumsky Decl.

2  ¶ 4.)  Accordingly, Washington courts shift the burden to the Halls "to come forward

3  with evidence that [their] damages were greater than the amount of settlement."  *King*

4  *Cty. v. Jones*, No. 68226-1-I, 2013 WL 4606809, at *4 (Wash. Ct. App. Aug. 26, 2013).

5     The Halls' circumstances differ from *Peterson* and *Truong*, however, in that

6  Encompass was simultaneously suing Harper and negotiating a settlement and release of

7  claims.  (*See* 6/11/15 Hall Decl. ¶ 22, Ex. D at 1.)  The Halls argue that this

8  intermeddling by Encompass, coupled with evidence—computed in part by relying on

9  calculations by Encompass—that they are at least $248,394.00 from being made whole,

10  is sufficient to overcome the presumption that the settlement made them whole.  (*See*

11  Mot. at 6; Halls Resp. at 7; 6/11/15 Hall Decl. ¶¶ 26-28.)  Although this evidence is

12  sufficient for the Halls to avoid summary judgment in favor of Encompass, the court

13  declines to conclude that they have overcome the presumption as a matter of law.

14  Whether the Halls have overcome the presumption that their settlement with Harper made

15  them whole will be up to a jury.

16     In sum, the Halls had an equitable right to be made whole by the funds that

17  Encompass obtained from Harper.  It will be up to the Halls to prove at trial that their

18  settlement with Harper did not make them whole, and if it did not, the amount that is

19  required to do so.

20  //

21  //

22  //

**C.      What Constitutes "Making Claim" Under the Policy**

The Halls' policy requires that an insured seeking to invoke the replacement cost provision "make claim" within 180 days following the loss.[8] (*See* Policy at 7.)  Both parties seek summary judgment on what constitutes making claim under the policy. (*See* Mot. at 11-12; Resp. at 6-10.)  Despite numerous extensions by Encompass, the holdback deadline—the point by which replacement cost claims must be submitted—has lapsed. (*See* McCormack Decl. ¶ 3, Ex. B at 1 (extending the deadline, for the final time, to April 10, 2015).)  The Halls argue that making claim requires only providing notice of the intent to replace property. (*See* Mot. at 11-12.)  They have provided Encompass notice of their intent to replace a number of different items, some of which they had not actually replaced by the April 10, 2015, deadline. (*See* Compl. at 9.)  Encompass contends that the policy's making claim requirement requires actually replacing the property within the 180-day window. (*See* Resp. at 6-10.)  Thus, Encompass argues, by failing to replace those items by the final April 10, 2015, holdback deadline, any further replacement cost claims by the Halls are foreclosed. (*See id.*)

Washington courts interpret insurance policies by giving them "a fair, reasonable and sensible construction, consonant with the apparent object and intent of the parties, a

---

[8] The Halls' policy covers tangible personal property on a replacement cost basis, without deduction for depreciation. (*See* Policy at 6.)  The policy provides a two-step basis under which an insured may make claim. (*See id.* at 7.)  First, an insured may "make claim . . . for loss or damage on an actual cash value basis (with deduction for depreciation)." (*Id.*)  Second, the insured may "make claim within 180 days after loss for any additional liability on a replacement cost basis." (*Id.*)  Essentially, after the Halls replace an item, this second step allows them to be compensated for the depreciation that Encompass deducts from the actual cash value it pays out in the first stage.  The issue is whether their opportunity to do so under the policy has lapsed.

1    construction such as would be given the contract by the average [person] purchasing

2    insurance." *Morgan v. Prudential Ins. Co. of Am.*, 545 P.2d 1193, 1195 (Wash. 1976)

3    (citing *Ames v. Baker*, 415 P.2d 74 (Wash. 1966)).  Encompass argues that the term

4    "make claim" unambiguously requires actual replacement of the item by the deadline, at

5    least when read in the context of the policy.  (*See* Encompass Reply at 5-6); *see also Hess*

6    *v. N. Pac. Ins. Co.*, 859 P.2d 586, 589 (Wash. 1993) ("Complexity or the necessity to

7    interrelate policy provisions does not alone render a policy ambiguous.").  The policy

8    allows an insured to first "make claim . . . on an actual cash value basis" and "then make

9    claim within 180 days after loss for any additional liability on a replacement cost basis."

10    (Policy at 7.)  The policy clarifies that recovery for any more than actual cash value

11    cannot occur "until actual repair or replacement is complete."  (*Id.*)  Taken together,

12    Encompass posits, this two-step process makes clear that an insured must have actually

13    replaced the item in order to "make claim" for replacement costs.  (*See* Encompass Reply

14    at 5.)  Encompass also points out the logical contrast this understanding creates with

15    actual cash value claims, which estimate an object's value subject to depreciation and

16    thus do not require replacement in order to make claim.  Encompass first alerted the Halls

17    no later than September 23, 2013, that it read the policy in this way, which the Halls have

18    disputed since.  (*See* 6/11/15 Hall Decl. ¶ 14, Ex. B at 16; 7/20/15 Hall Decl. (Dkt. # 18)

19    ¶ 11.)

20         The court finds both parties' understanding of the term "make claim" to be

21    reasonable, and thus disagrees with Encompass that it is unambiguous.  As a threshold

22    matter, Encompass cannot alter the term's meaning by informing the Halls of its contrary

1 | interpretation because "unilateral and subjective beliefs about the impact of a written

2 | contract do not constitute evidence of the parties' intent," which is the touchstone of

3 | contract interpretation. *See Watkins v. Restorative Care Ctr., Inc.*, 831 P.2d 1085, 1092

4 | (Wash. Ct. App. 1992). Turning to a textual analysis, the policy uses identical "make

5 | claim" language with respect to actual cash value claims and reimbursement cost claims,

6 | giving credence to the idea that they require similar processes. (*See* Policy at 7.)

7 | Additionally, the limitation that Encompass "will pay no more than the actual cash value

8 | for the loss or damage until actual repair or replacement is complete" is compatible with

9 | the Halls' interpretation. (*See* Policy at 7.) This limitation and the policy's provision on

10 | when to make claim are distinct provisions in the policy, rendering more reasonable the

11 | interpretation that the limitation describes when reimbursement will be issued rather than

12 | how to properly make claim. (*See id.*) In other words, it is reasonable to understand the

13 | replacement cost provision as operating as the Halls argue: "[A]s long as the Halls' [sic]

14 | have 'made claim' within 180 days, Encompass must pay the Halls the replacement cost

15 | value of their property once the Halls actually replace that property." (*See* Halls Reply at

16 | 8.) The precedent that Encompass cites is unpersuasive because each case either holds

17 | that "*replacement* of the damaged property is a condition precedent to *recovery*," *D & S*

18 | *Realty, Inc. v. Markel Ins. Co.*, 816 N.W.2d 1, 12 (Neb. 2012) (emphasis added), which is

19 | consonant with the Halls' interpretation, or interprets and applies different and

20 | unambiguous contractual language, *see, e.g.*, *Sher v. Allstate Ins. Co.*, 947 F. Supp. 2d

21 | 370, 381 (S.D.N.Y. 2013) (interpreting a policy that paid reimbursement costs if the

22 |

1   insured "repair[s], rebuild[s,] or replace[s] damaged, destroyed, or stolen covered

2   property within 180 days of the actual cash value payment").

3        If a term in an insurance policy is "subject to more than one reasonable

4   interpretation, the interpretation most favorable to the insured will be applied." *Allstate*

5   *Ins. Co. v. Peasley*, 932 P.2d 1244, 1247 (Wash. 1997). "This principle applies with

6   added force" when the ambiguity concerns an exception to or limitation of coverage.

7   *Queen City Farms, Inc. v. Central Nat. Ins. Co. of Omaha*, 882 P.2d 703, 721 (Wash.

8   1994). Accordingly, the court concludes that the 180-day limitation for replacement cost

9   claims required only notice within 180 days and not actual replacement. Nonetheless, as

10  Encompass argues, it is not reasonable to infer that providing timely notice entitles the

11  Halls to "maintain their replacement cost claim forever." (Encompass Reply at 3.) In

12  other words, the "average [policyholders] purchasing [this] insurance" policy, while they

13  could interpret it to require only notice of intent to replace within 180 days, would

14  assume that they must nonetheless actually replace those items in a reasonable time

15  period. The Halls cannot unduly delay replacement simply because they have made

16  claim on an item within the holdback period. (*See Morgan* 545 P.2d at 1195.) On this

17  record, the Halls can plausibly contend that their delay in replacement is reasonable due

18  to the time Encompass's investigation consumed and the uniqueness of the destroyed

19  items, whereas Encompass can argue the contrary by pointing to the multiple years by

20  which it extended the holdback deadline. In other words, whether the Halls have

21  unreasonably delayed replacement of their goods is subject to reasonable dispute on this

22  record.

ORDER- 20

1   Accordingly, whereas the court grants the Halls summary judgment that the 180-

2   day clause requires only providing notice of intent to replace the item, that interpretation

3   is subject to the caveat that the Halls' delay in replacement cannot be unreasonable.  It

4   will be up to a jury to determine whether the Halls have unreasonably delayed.  If they

5   have unreasonably delayed replacement with respect to any of the items for which they

6   provided timely notice of intent to replace, the Halls will be barred from recovering the

7   difference between the replacement cost and the actual cash value for those items.

8   **D.   Right to Appraisal and Stay Pending Outcome**

9   Encompass next requests an order requiring submission to appraisal any dispute

10  over actual cash value of the goods, as well as a stay of the case pending the outcome of

11  that appraisal. (*See* Resp. at 13-15.) Encompass invokes its appraisal rights pursuant to

12  the insurance policy, which provides that either party may demand appraisal if the parties

13  do not agree on the amount of loss. (*See* Policy at 17.) The Halls respond that invocation

14  of appraisal is untimely and inapplicable to the case at bar. (*See* Halls Reply at 13-14.)

15  In any event, they argue a stay pending appraisal is inappropriate, since Encompass

16  would suffer no hardship or inequity from the court declining to issue a stay pending

17  appraisal. (*See id.* at 14-15.)

18  The timeliness of a demand for appraisal "in each case depends upon the

19  circumstances as they existed at the time the demand was made." *Keesling v. W. Fire*

20  *Ins. Co. of Fort Scott, Kan.*, 520 P.2d 622, 626 (Wash. Ct. App. 1974).  When, as in the

21  Hall's policy, there is no express or implied limitation on the time to make such a

22  demand, "it is inferred that the parties contemplated that such demand must be made

1   within a reasonable time after disagreement has arisen as to the amount of loss." *Id.* at

2   627 (quoting *Sch. Dist. No. 1 of Silver Bow Cty. v. Globe & Republic Ins. Co. of Am.*, 404

3   P.2d 889, 893 (Mont. 1965)).  A party may waive such a right expressly or implicitly, but

4   waiver must be "intentional and voluntary."  *See Bowman v. Webster*, 269 P.2d 960, 961

5   (Wash. 1954).  In the context of insurance policies providing for appraisal, two factors

6   have been decisive in determining whether such clauses were implicitly waived:

7   "prejudice resulting from the delay, and the breakdown of good-faith negotiations

8   concerning the amount of loss."  *Keesling*, 520 P.2d at 628.

9          This case does not differ meaningfully from *Meyer Floor*, in which this court

10  deemed a similar appraisal provision waived, and the court accordingly concludes that

11  Encompass waived its right to appraisal.  *See Meyer Floor Covering Inc. v. Travelers*

12  *Indem. Co.*, No. C12-5596RBL, 2013 WL 316200, at *4 (W.D. Wash. Jan. 28, 2013).  In

13  that case, this court determined that two-and-a-half years between the plaintiffs' loss and

14  the insurer's invocation of appraisal rights "suggest[ed] that the right was waived." *Id.*

15  Although the insurer spent that time negotiating with the insured and his hired adjuster,

16  both parties remained largely entrenched in their positions for years, indicating a

17  breakdown of good-faith negotiations.  *See id.*  The prejudice to the party opposing

18  appraisal—including delay, attorney's fees, and the costs of suit—was also central to the

19  *Meyer Floor* court's conclusion.

20         In the instant case, Encompass sought to invoke the appraisal provision for the

21  first time on June 16, 2015, exactly three-and-a-half years after the fire at the Halls'

22  property. (*See* McCormack Decl. ¶ 5, Ex. D at 1.)  In the interim, Encompass spent years

1  dealing directly with the Halls regarding their valuation disputes. (*See, e.g.*, Webster

2  Decl. ¶ 2, Ex. A at 1-36.) Encompass's initial valuation, which Ms. Webster conveyed to

3  the Halls on September 23, 2013, was for $62,651.62 (*see* 7/20/15 Hall Decl. ¶ 10, Ex. C

4  at 1); nine months later, its valuation increased more than fourfold to $259,027.54 (*see id.*

5  ¶ 17, Ex. I at 1.) This was the only meaningful movement on the part of either side,

6  which occurred two-and-a-half years after the fire. The Halls have stood by their higher

7  valuation estimate throughout the process, and have on several occasions stepped in to

8  correct Encompass on that front. (*See, e.g., id.* ¶ 12.) Encompass could have invoked its

9  appraisal rights at any point in time, but it waited to do so until June 16, 2015, two

10  months after this lawsuit was filed, six months after the Halls filed notice of their intent

11  to claim an IFCA violation, and 20 months after Mr. Hall first notified Encompass of his

12  valuation dispute. (*See* McCormack Decl. ¶ 5, Ex. D at 1; Compl. at 1; 6/11/15 Hall

13  Decl. ¶ 14, Ex. B at 8, 17; 7/20/15 Hall Decl. ¶ 13, Ex. E.) In addition, the Halls have

14  spent countless hours of their own time (*see* 7/20/15 Hall Decl. ¶ 20), hired an assistant to

15  help with the valuation (*id.* ¶ 12), hired counsel, and maintained this lawsuit. In other

16  words, the process has been "anything but" the "plain, inexpensive, and speedy

17  determination of the extent of the loss" that appraisal is intended to be. *Meyer Floor*,

18  2013 WL 316200, at *4; *Keesling*, 520 P.2d at 625. The Halls have been prejudiced by

19  the delay as a result of the parties finding themselves at loggerheads over valuation for

20  years.

21         In sum, Encompass's demand is not "within a reasonable time after disagreement

22  has arisen as to the amount of loss," so its time to invoke contractual appraisal rights has

1  passed. *See Keesling*, 520 P.2d at 627.  Because Encompass implicitly waived its right to

2  appraisal, the court denies its motion to stay the case and invoke appraisal rights.

3  **E.    Violation of the Insurance Fair Conduct Act**

4       Encompass seeks summary judgment dismissing the Halls' claim that it violated

5  IFCA. (*See* Resp. at 12-13.)  IFCA provides a cause of action when an insurance policy

6  claimant is "unreasonably denied a claim for coverage or payment of benefits by an

7  insurer."  RCW 48.30.015(1).  Encompass contends that the Halls' IFCA claim is

8  unsustainable as a matter of law because it is based on reimbursement cost claims, which

9  Encompass has paid in full, and which can no longer be made because the time to do so

10  has lapsed. (*See* Resp. at 13.)  Accordingly, Encompass concludes, its denial of payment

11  to the Halls cannot be "unreasonable," and thus no IFCA violation occurred. (*See id.*)

12       As discussed herein, the court concludes as a matter of law that the Halls'

13  interpretation of the 180-day replacement cost provision is correct.  *See supra* Part III.C.

14  Moreover, the Halls allege that the IFCA violation relates to Ms. Webster's deficient

15  valuation process and an unreasonable refusal to pay the "undepreciated value of lost

16  collectibles and artwork." (*See* Halls Reply at 16.)  In response to these allegations,

17  Encompass makes only general assertions that the Halls have not provided sufficient

18  evidence to maintain their claim and cites to *Morella*. (*See* Encompass Reply at 7 (citing

19  *Morella v. Safeco Ins. Co. of Ill.*, No. C12-0672RSL, 2013 WL 1562032, at *3 (W.D.

20  Wash. Apr. 12, 2013)).)  Encompass is correct that it does not constitute a *per se*

21  unreasonable denial of payments under IFCA that the insured eventually receives more

22  benefits than the insurer initially offered. (*See id.*)  However, the Halls do not contend

1  that the difference between Mr. Hall's and Ms. Webster's valuation is itself an IFCA

2  violation, but rather that it constitutes further evidence that Encompass's initial valuation

3  was unreasonable. (*See* Halls Reply at 16-17.)  The Halls make several additional

4  contentions that the initial payments were not reasonable, which they reinforce with

5  circumstantial evidence. (*See id.*)  For instance, the Halls argue that it was unreasonable

6  for Ms. Webster to spend "barely a half day inventorying the extensive contents losses"

7  at the fire site and to repeatedly wrongfully include depreciation in her valuations. (*Id.* at

8  16.)  These are facts from which a reasonable juror could conclude that Encompass

9  violated IFCA by unreasonably denying benefits.  *See* RCW 48.30.015(1).

10         In sum, granting all reasonable inferences to the Halls, genuine disputes of

11  material fact remain and thus Encompass is not entitled to summary judgment on the

12  Halls' IFCA claims.  However, the court concludes herein that both parties' conflicting

13  interpretations of the 180-day limitation on replacement costs are reasonable.  *See supra*

14  Part III.C.  Accordingly, the court grants Encompass summary judgment on this limited

15  basis:  The Halls cannot contend that Encompass's interpretation of this clause, and its

16  subsequent denial of payments due to the Halls' failure to comply with the clause as

17  Encompass understood it, constituted an IFCA violation.  (*See* Halls Reply at 16.)

18  **F.     Tort of Insurance Bad Faith**

19         Encompass seeks summary judgment dismissing the Halls' claim that it committed

20  the tort of insurance bad faith.  (*See* Resp. at 16.)  To prove bad faith, an insured must

21  show that its insurer's denial of benefits was "unreasonable, frivolous, or unfounded," as

22  opposed to simply incorrect.  *Kirk v. Mt. Airy Ins. Co.*, 951 P.2d 1124, 1126 (Wash.

1   1998).  In support of its argument, Encompass provides only a citation to *American*

2   *Manufacturers v. Osborn*, which it argues "held that a difference between the insurer's

3   pre-Appraisal payment and the Appraisal award is not itself evidence of bad faith." (*Id.*

4   (citing *Am. Mfrs. Mut. Ins. Co. v. Osborn*, 17 P.3d 1229 (Wash. Ct. App. 2001).)  This is

5   not the holding of *Osborn*, which only held that a discrepancy between the initial offer

6   and the final award is insufficient evidence *standing alone* to overcome a defendant's

7   summary judgment motion on claims of bad faith and violation of the CPA.  *Osborn*, 17

8   P.3d at 1235-36 (citing *Keller v. Allstate Ins. Co.*, 915 P.2d 1140, 1144-45 (Wash. Ct.

9   App. 1996)).  Here, in contrast, the Halls have provided several additional pieces of

10   circumstantial evidence that Encompass's behavior was unreasonable—Ms. Webster's

11   overly brief evaluation of damage, the duration of Encompass's claims process, and the

12   depreciation of collectibles and artwork after confirming that none should be taken. (*See*

13   Halls Reply at 16.)

14        These disputed facts are clearly material to whether Encompass committed the tort

15   of bad faith, and summary judgment is thus inappropriate on that claim.

16                              **IV.    CONCLUSION**

17        Based on the foregoing analysis, the court GRANTS in part and DENIES in part

18   the Halls' motion for partial summary judgment (Dkt. # 8).  The court grants the Halls'

19   motion in all respects except that 1) the Halls must prove at trial that they were not made

20   whole by their settlement, and to what extent, and 2) a jury will be entitled to determine

21   whether the Halls' delay has been reasonable in replacing items to which they made

22   claim by the holdback deadline.  Furthermore, the court GRANTS in part and DENIES in

1 part Encompass's motion for summary judgment (Dkt. # 11).[9]  The court grants

2 Encompass's motion only in that the Halls cannot contend Encompass's interpretation of

3 the 180-day clause was unreasonable; in all other respects, the court denies Encompass's

4 motion.

5        Dated this 21st day of September, 2015.

6

7                                          _____
                                           JAMES L. ROBART
8                                          United States District Judge

9

10

11

12

13

14

15

_____

16      [9] Whether deliberately or inadvertently, Encompass does not specifically mention the
Halls' CPA claims in its cross-motion for summary judgment. (*See generally* Resp. at 12-16.)
17 Although the final heading in Encompass's cross-motion for summary judgment references "the
remainder of the Halls' extra-contractual claims," which would include the Halls' CPA claim,
18 that section goes on to discuss only their bad faith claim. (*See id.* at 16 ("Conceptually, the only
issue left . . . is the Halls' common law extra-contractual claim for bad faith.").)  The Halls note
19 this in their reply and flag that Encompass's motion fails to address its CPA claim. (*See* Halls
Reply at 17 n.10.)  Encompass subsequently declines to address the CPA claim in its reply brief,
20 again merely referencing "all extra-contractual claims." (*See* Encompass Reply at 7.)  "As the
Seventh Circuit observed in its now familiar maxim, '[j]udges are not like pigs, hunting for
21 truffles buried in briefs.'" *Indep. Towers of Wash. v. Wash.*, 350 F.3d 925, 929 (9th Cir. 2003)
(quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)).  Because Encompass failed
22 to sufficiently present the issue to the court, it does not consider whether the Halls' CPA claim is
subject to summary judgment.

ORDER- 27